# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
### No. 19-1406V
### UNPUBLISHED

| | |
|---|---|
| JOSEPH FILIPOVICH,<br><br>    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>    Respondent. | Chief Special Master Corcoran<br><br>Filed: November 7, 2022<br><br>Special Processing Unit (SPU); Table Injury Dismissal; Influenza (Flu); Shoulder Injury Related to Vaccine Administration (SIRVA); Prior Shoulder Pain |

*David John Carney*, Green & Schafle, LLC, Philadelphia, PA, for Petitioner.

*Mark Kim Hellie*, U.S. Department of Justice, Washington, DC, for Respondent.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING TABLE CLAIM**[1]

  On September 12, 2019, Joseph Filipovich filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges a Table injury - that he suffered a shoulder injury related to vaccine administration ("SIRVA") after receiving an influenza ("flu") vaccine on September 14, 2016. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU") after Pre-Assignment Review.

---

[1] Because this unpublished opinion contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the opinion will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

As discussed below, dismissal of the alleged Table SIRVA claim is warranted, since the record does not substantiate some of the elements of such a claim. Petitioner will, however, be afforded the opportunity to pursue a non-Table claim, outside of SPU.

## I.   Relevant Procedural History

As noted above, this case was initiated in September 2019. On May 17, 2021, after attempting to resolve this case informally, Petitioner filed a status report stating that the parties had reached an impasse. ECF No. 28. At Petitioner's request, I thereafter set deadlines for the filing of briefs addressing both Petitioner's entitlement to compensation and an appropriate award of compensation. ECF No. 29.

On July 22, 2021, Petitioner filed a Motion for Ruling on Record and Brief in support of Damages. ECF No. 31. On September 7, 2021, Respondent filed his Rule 4(c) Report and Response to Petitioner's Motion, recommending that entitlement to compensation be denied under the terms of the Vaccine Act. ECF No. 33. Specifically, Respondent argued that Petitioner had failed to establish that he suffered the Table injury of SIRVA, because (a) Petitioner has a history of right shoulder pain, (b) Petitioner has not established that the onset of his shoulder symptoms began within 48 hours of his vaccination, and (c) Petitioner's pain was not limited to the shoulder in which he received the vaccine. ECF No. 33 at 7-8. Thus, Respondent argues Petitioner cannot meet the first three QAI requirements for a Table case. *Id.* (citing 42 C.F.R. § 100.3(c)(10)(i-iii)).[3] Petitioner filed a Reply brief and supplemental affidavit on September 21, 2021. ECF Nos. 34-35.

## II.   Issue

At issue is whether Petitioner is able to satisfy the first criterion of the Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA claim, which requires "[n]o history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection." 42 C.F.R. § 100.3(c)(10)(i).[4]

---

[3] Respondent further argued that (in the event the claim succeeded) Petitioner should be awarded a lower sum of damages than requested. ECF No. 33 at 12.

[4] As I find that this issue is dispositive in regard to whether Petitioner has established a Table SIRVA, it is not necessary to resolve whether Petitioner has satisfied the remaining QAI requirements for a Table SIRVA.

2

### III. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). In making this determination, the special master or court should consider the record as a whole. *Id*. Further, Petitioner's allegations must be supported by medical records or by medical opinion. *Id*.

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement, a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, provides the criteria for establishing a Table SIRVA as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

IV.  **Relevant Factual Evidence**

I have reviewed all of the records filed to date. This ruling, however, is limited to determining whether Petitioner has established that he had no history of pain, inflammation, or dysfunction of his right shoulder that would explain the shoulder symptoms he experienced after his September 2016 flu shot. Accordingly, I will only summarize or discuss evidence that pertains to this issue.

- Nine months before the vaccination at issue, Petitioner presented to James Mantzaris, D.O., on January 4, 2016. Ex. 3 at 150. The medical note documenting this appointment indicates that Petitioner "ha[d] some pain in the left wrist and right shoulder. *Chronic* and has been helped by chiropractor in past[5] and seems to be worsened by work. He is looking for a referral." *Id.* at 153 (emphasis added). A musculoskeletal exam found "good [range of motion] of the left wrist and shoulder and has some tenderness of the right trap[ezius muscle] and upper back." *Id*. Petitioner was assessed with "shoulder strain, right, subsequent encounter" and "left hand pain" – he was given a referral to consult with a chiropractor in regard to these diagnoses. *Id.* at 155-56.

- A separate referral order issued that same day (January 4, 2016) for an ambulatory consult to chiropractic care listed the associated diagnoses as "[s]houlder strain, right, subsequent encounter" and "[l]eft hand pain." Ex. 7 at 104.

- On February 22, 2016, Petitioner completed intake paperwork at Natural Care Center of Woodbury. Ex. 7 at 82-103.  Included in these forms was an acupuncture new patient intake form. Ex. 7 at 92.  In response to the question "[w]hat is your reason for visiting our clinic?", Petitioner answered "swollen finger tendons, sore arm, back + shoulder pain, stress." *Id.* at 92. A massage intake form was also included in these forms, and again, Petitioner self-described his "reason for seeking care at our clinic" as "Back/Shoulder Pain, swollen fingers." *Id.* at 83.

---

[5] Petitioner has filed medical records documenting numerous appointments between May 14, 2014 and October 20, 2017 at The New Art of Chiropractic/The Family Wellness Center where he received treatment from several different chiropractors. *See* Ex. 6 at 1-26.  Petitioner's primary "subjective" complaints at these appointments related to right neck, upper back, and mid back pain. *Id.*

4

- On February 23, 2016, Petitioner was seen by Jamie Schafer, an acupuncturist. Ex. 7 at 1. Ms. Schafer's record documents that Petitioner "states that he has been having back *and shoulder* pain for the past 10 years from playing guitar. He plays (and teaches) guitar for work during the day, and at night as well." *Id.* (emphasis added). Ms. Schafer indicates that Petitioner "feels most of his pain in the scapular border, and feels tight stubborn knots in this region on a regular basis." *Id.* Ms. Schafer also documents specific "[p]ain in his left anterior arm (this is the arm he holds his guitar with, and plays with his right.) This feels most bothersome in his forearm and into the hand, especially the middle finger. He does not report any numbness or tingling into the hand." *Id.* Ms. Schafer diagnosed Petitioner with "[p]ain in thoracic spine" and "[p]ain in unspecified finger(s)." *Id.*

- Petitioner was seen again the next day, February 24, 2016, by David Smith, DC. Dr. Smith indicates that "[p]atient plays guitar all day and night. He states that he is sore from being hunched over all day and night. He states that his left fingers are swollen and tight due to always playing guitar." Ex. 7 at 2. A history recorded in this record indicates "Chief Complaint: an acute left posterior hand, left trapezius, upper thoracic, right posterior trapezius, right mid thoracic, left anterior hand, left posterior forearm and left anterior forearm complaint . . . . This complaint has been ongoing for the past couple years." *Id.* Dr. Smith's diagnoses included, but where not limited to: segmental and somatic dysfunction of lumbar region, segmental and somatic dysfunction of the upper extremity, and pain in left elbow. *Id.* at 5.

- Petitioner continued to treat with multiple chiropractors, and Ms. Schafer, at different offices in the ensuing months. *See generally*, Exs. 6-7. On April 5, 2016, Petitioner reported to Ms. Schafer that he "continue[d] to experience pain and stiffness in his upper back *and shoulders*, scapular border." Ex. 7 at 22 (emphasis added).

- On August 22, 2016, Petitioner was seen by Andrew Armeli, DC. Ex. 6 at 6-7. Dr. Armeli recorded that Petitioner suffered "subjective" symptoms of right-sided neck pain, upper back pain, and mid-back pain. *Id.* at 6. Dr. Armeli, however, made

"objective" findings that, among other things, Petitioner had experienced mild to moderate hypertonicity[6] of both the left and right shoulder. *Id.*[7]

- Petitioner was seen that same day by Dr. David Smith with chief complaints that included: left hand pain, left anterior forearm pain, right and left posterior forearm aching and tightness, stiffness and discomfort. Ex. 7 at 34.

- On September 14, 2016, Petitioner received a flu vaccination in his right shoulder from Walgreen's Pharmacy. Ex. 2 at 2-3.

- On September 19, 2016 Petitioner was seen again by both Drs. Smith and Armeli for his continued chiropractic treatment. No new shoulder complaints were reported at either appointment. Ex. 6 at 5-6; Ex. 7 at 36-37.

- On October 4, 2016, Petitioner was seen again by his primary care physician, Dr. Mantzaris. Petitioner reported at this visit that it was "[h]ard for him to squeeze his left hand fingers together. Would like a referral. Also got flu shot in his right arm a

---

[6] The National Institute of Neurological Disorders and Strokes provides the following definition and prognosis for hypertonia.

> Hypertonia is a condition in which there is too much muscle tone so that arms or legs, for example, are stiff and difficult to move. Muscle tone is regulated by signals that travel from the brain to the nerves and tell the muscle to contract. Hypertonia happens when the regions of the brain or spinal cord that control these signals are damaged. This can occur for many reasons, such as a blow to the head, stroke, brain tumors, toxins that affect the brain, neurodegenerative processes such as in multiple sclerosis or Parkinson's disease, or neurodevelopmental abnormalities such as in cerebral palsy.
>
> Hypertonia often limits how easily the joints can move. If it affects the legs, walking can become stiff and people may fall because it is difficult for the body to react quickly enough to regain balance. If hypertonia is severe, it can cause a joint to become "frozen," which doctors call a joint contracture.
>
> . . . .
>
> The prognosis depends upon the severity of the hypertonia and its cause. In some cases, such as cerebral palsy, the hypertonia may not change over the course of a lifetime. in other cases, the hypertonia may worsen along with the underlying disease If the hypertonia is mild, it has little or no effect on a person's health. If there is moderate hypertonia, falls or joint contractures may have an impact on a person's health and safety. If the hypertonia is so severe that is caused immobility, potential consequences include increased bone fragility and fracture, infection, bed sores, and pneumonia.

https://www.ninds.nih.gov/health-information/disorders/hypertonia (last visited November 7, 2022).

[7] The "objective" finding of mild to moderate hypertonicity of both the left and right shoulder was a recurring observation by Petitioners' chiropractors at the Family Wellness Center between 2014 and 2017. *See, e.g.* Ex. 6.

few weeks ago, he is still having some sharp pains when he moves his arm." Ex. 3 at 174.  A musculoskeletal exam noted that petitioner had "good rom of the fingers passively; good rom of fingers passively; has less than full rom of the index finger of the left hand." *Id.* at 175. No examination of the shoulder was noted. Petitioner was assessed with "[a]ttention deficit" and "[p]ain of finger of left hand." *Id.*

- On October 5, 2016, Petitioner was evaluated by Naomi Krueger, PA-C, at Summit Orthopedics. He was assessed with "left upper extremity hand and forearm pain from repetitive guitar playing, likely carpal tunnel syndrome." Ex. 4 at 1. The visit focused on his left hand pain and noted "patient reports no other musculoskeletal or neurologic complaints." *Id.* It was discussed that he would begin hand therapy. *Id.*

- Petitioner began physical therapy for his hand on October 11, 2016. Ex. 4 at 3-5. He did not report any shoulder pain. *Id.*

- On October 25, 2016, Petitioner returned to his PCP, Dr. Mantzaris, with a chief complaint of "Pain in Right Deltoid at the site of flu shot given five weeks ago. Pain goes into his pec[torlis] muscle." Ex. 3 at 181. He reported he had "right arm pain since he had a flu shot in September." *Id.*  A musculoskeletal exam found "he ha[d] no pain with palpation and he has good rom." *Id.* Dr. Mantzaris assessed Petitioner with "chronic right shoulder pain," and noted he was "[u]ncertain that flu shot would have caused this and may be a coincidence in timing with shoulder pain." *Id.* at 182.

- Petitioner did not treat again for his alleged post-vaccination right shoulder pain from October 26, 2016 until June 21, 2017. Ex. 4 at 20. He did receive continued physical therapy for his hand, Ex. 4 at 6-19, and continued chiropractic care for his numerous upper extremity complaints, Ex. 6 at 3-4; Ex. 7 at 40-53. He did not report specific right shoulder complaints at these appointments.[8]

- However, at a January 16, 2017, chiropractic appointment with Dr. Smith, Petitioner reported that he "[s]till feels a lot of knots in his upper back and shoulder *bilaterally* and mostly on the right from playing guitar . . . ." Ex. 7 at 44.

- On June 21, 2017, Petitioner saw Ms. Krueger at Summit Orthopedics again in regard to right shoulder pain and bilateral hand complaints. Ex. 3 at 20. It was noted that Petitioner "state[d] he received a flu shot last September [in] the right

---

[8] However, Dr. Armeli continued to document an "objective" finding that Petitioner's had "mild-moderate" hypertonicity of his right shoulder – a finding first made on June 9, 2014. Ex. 6 at 3-4, 25.

7

shoulder. Following the injection he had significant shoulder pain for a few weeks. He states that the severe pain had improved but has had ongoing right shoulder pain for the past several months." *Id.* The record notes he was seen by his PCP and declined an injection. Petitioner also reported he had received hand therapy for right hand pain which has been helpful, and that he is a guitar player and music instructor who performs a lot of repetitious activity. *Id.* Petitioner also complained of bilateral wrist pain extending to the lateral aspect of the elbow. Petitioner requested he resume therapy on his right hand and address the pain in his forearms. *Id.*

- Ms. Krueger assessed Petitioner with right shoulder subacromial bursitis and bilateral lateral epicondylitis or tennis elbow. She noted that he (again) was not interested in an subacromial cortisone injection for his shoulder and "discussed that [it] is unlikely his flu shot [caused] persistent pain into his shoulder." *Id.*

- Petitioner engaged in seven physical therapy sessions for his right shoulder between July 6, 2017, and October 26, 2017. His physical therapy records document his pain as commencing with September 21, 2016 flu shot. Ex. 4 at 23. At his final therapy session for his right shoulder, it was noted that he had a "pain-free WNL [within normal limited] shoulder AROM." Ex. 4 at 69. Petitioner received no further treatment for his alleged right shoulder pain following vaccination.

## V.  Findings of Fact and Dismissal of Table Claim

The medical record does not preponderantly support the first criterion for a Table SIRVA, which requires "[n]o history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection." 42 C.F.R. § 100.3(c)(10)(i). Rather, it establishes consistently that Petitioner had a history of pre-vaccination right shoulder issues extending back to as early as 2014. *See, e.g.,* Ex. 6 at 26 (chiropractic "objective" finding of "mild-moderate" hypertonicity of Petitioner right shoulder – a finding first made on May 14, 2014, and repeatedly documented thereafter by chiropractors at the Family Wellness Center thereafter). [9]

---

[9] Petitioner attempts to dismiss this finding in his Reply, noting merely that it meant both his shoulders felt the same (mild-moderate) and thus is "not an issue." Petitioner's Reply at 3. However, while "mild-moderate" hypertonicity is not a "severe" finding, it is a positive "objective" finding, as opposed to a normal or neutral finding, and is indicative of shoulder dysfunction. Additionally, Petitioner's left shoulder was initially noted to have only "mild" hypertonicity, Ex. 6 at 24-26, before increasing to mild-moderate like his right shoulder, Ex. 6 at 23.

By January 4, 2016, Petitioner's explicit complaints to his PCP included right shoulder pain, he was assessed by his PCP with a right shoulder strain, and referred to a chiropractor for his right shoulder strain. Ex. 3 at 150, 153-55 (Petitioner reporting to his PCP he "has some pain in the left wrist and right shoulder. Chronic and has been helped by chiropractor in past."); Ex. 7 at 104 (referral order to an ambulatory consult to chiropractic care for "shoulder strain, right, subsequent encounter" and [l]eft hand pain"). The next month, on February 23, 2016, Petitioner completed patient intake paperwork in which he affirmatively characterized the reason for visiting the Natural Care Center of Woodbury clinic as "swollen finger tendons, sore arm, back + *shoulder pain*, stress." Ex. 7 at 92 (emphasis added); Ex. 7 at 83 (describing "Back/Shoulder pain, swollen fingers" as his "reason for seeking care at our clinic"). The following day, Petitioner reported to his acupuncturist, Ms. Schafer, that he had "been having back and *shoulder pain for the past 10 years from playing guitar*." Ex. 7 at 1 (emphasis added).

Petitioner in his affidavit denies any pre-vaccination shoulder pain. Ex. 11, ¶¶ 6-7. But this allegation is rebutted by the contemporaneous medical record which documents multiple reports of pre-vaccination issues with Petitioner's right shoulder – including patient intake forms presumptively filled out by Petitioner himself. Ex. 7 at 83, 92.

In his Reply brief, Petitioner attempts to minimize the medical record documentation of his pre-vaccination right shoulder issues, arguing that his PCP conflated his trapezius issues with the shoulder. Reply at 3. It is the case that Petitioner's right shoulder pain was not the only (or even close to the primary) issue for which Petitioner treated between 2014 and 2016. Rather, in this timeframe he received medical treatment for a number of upper extremity problems relating to his guitar playing and teaching - most significantly neck, back, and hand issues. However, the medical record clearly establishes that Petitioner suffered right shoulder pain and problems prior to his September 2016 flu vaccination. Additionally, despite reporting right shoulder pain to his PCP both before *and after* his vaccination, his range of motion was found to be "good" by his PCP upon musculoskeletal examination on both occasions. Ex. 3 at 150, 153-54 (pre-vaccination exam January 4, 2016); Ex. 3 at 179, 181 (post-vaccination exam October 25, 2016).[10]

Based on the foregoing, Petitioner cannot satisfy the first QAI criterion for a Table SIRVA.

---

[10] It does not appear that range of motion deficits were recorded by Petitioner's providers in regard to his right shoulder until July 2017. Ex. 4 at 24.

## VI. Potential for Off-Table Claim

A petitioner's failure to establish a Table injury does not necessarily constitute the end of the case, because he or she might well be able to establish a non-Table claim for either causation-in-fact or significant aggravation. *See Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005); *W.C. v. Sec'y of Health & Human Servs.*, 704 F.3d 1352, 1357 (Fed. Cir. 2013) (citing *Loving v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 135, 144 (2009)).

Despite the preponderant evidence that Petitioner's shoulder pain predated his vaccination, it is conceivable that the Petitioner could establish that the vaccination at issue worsened those symptoms, and thus that he could successfully maintain a significant aggravation claim. But formal resolution of such a version of the claim will likely require further review and most likely the retention of experts, which I am not inclined to authorize in the SPU.

## Conclusion

Petitioner has not satisfied the first QAI criterion for a Table SIRVA. Accordingly, his Table SIRVA claim is dismissed. Pursuant to Vaccine Rule 3(d), I will issue a separate Order reassigning this case out of SPU.

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master